# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-_____

TODD ROWELL, in his individual capacity,
MATTHEW KING, in his individual capacity, and
CURTIS BRAMMER, in his individual capacity,

      Plaintiffs,

v.

PHILIP J. WEISER, in his official capacity as
the Attorney General for the State of Colorado, and
JARED POLIS, in his official capacity as the
Governor for the State of Colorado,

      Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Todd Rowell, Matthew King, and Curtis Brammer (collectively, "Plaintiffs") file their Complaint against Philip J. Weiser, in his official capacity as the Attorney General for the State of Colorado, and Jared Polis, in his official capacity as the Governor for the State of Colorado as follows:

### NATURE OF THE ACTION

1.    This case involves a series of Colorado statutes that were passed by the Colorado Legislature beginning in June 2021 through May 2025, known as "Article 74." *See* C.R.S. §§ 24-74-101 et seq.

2.    Article 74's provisions purport to limit political subdivision employees from disclosing or seeking personal information that is related to, or could be used in furtherance of,

1

federal civil immigration enforcement and each violation of Article 74's vague provisions subjects a "political subdivision employee" to a civil fine of up to $50,000 and an injunction.

3.     Article 74 is unconstitutionally vague because multiple provisions lack sufficient definiteness as detailed herein. The overly broad nature of Article 74 has also resulted in selective and inconsistent application and enforcement across different political subdivision employees. Further, these statutes violate the Supremacy Clause because, on their face, they run counter to federal law.

4.     The vagueness and lack of clarity surrounding the operation and scope of Article 74, coupled with the severe penalties and hardships for noncompliance, has caused confusion among law enforcement agencies, systemically chilled Plaintiffs' interactions with federal law enforcement, and caused the Mesa County Sheriff's Office ("MCSO") to pull back from cooperation with federal law enforcement agencies and, as a result, to lose grant funding. The interruption in law enforcement activities and inter-agency cooperation has impacted investigations of serious crimes within Mesa County, including drug smuggling, child exploitation, and major sex crimes, ultimately impacting the prevalence of crime in Mesa County, and in turn Article 74 harms Plaintiffs as set forth herein.

5.     Plaintiffs, as political subdivision employees, have suffered, among other things, negative employment actions, interruptions in employment activities, disruption of decision-making authority, and proscriptions on job-related activities necessary to perform law enforcement functions. They also face a host of on-going violations of their rights due to the overbroad and vague nature of Article 74 and the corresponding arbitrary and capricious enforcement by the State

that is unguided by proper language within the statutes establishing the contours, obligations, duties and prescriptions necessary to pass constitutional muster.

6.      Until the contours of Article 74 are sufficiently defined, the application of its provisions will continue to have a negative impact on the collaborative relationships between local and federal law enforcement, the safety of the communities across Colorado, and on Plaintiffs directly.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Todd Rowell ("Rowell") is the elected Sheriff of Mesa County, Colorado. He brings this action in his individual capacity.

8.      Plaintiff Matthew King ("King") serves as Undersheriff for the Mesa County Sheriff's Office. He brings this action in his individual capacity.

9.      Plaintiff Curtis Brammer ("Brammer") serves as a Captain for the MCSO. He brings this action in his individual capacity.

10.     Defendant Philip J. Weiser ("Weiser") is the Colorado Attorney General. Weiser has authority to "independently initiate and bring civil and criminal actions to enforce state laws", C.R.S. § 24-31-101(1)(i); *see also* C.R.S. § 24-31-101(1)(p), and claims the authority to bring suit under Article 74.[1] Weiser is sued in his official capacity.

11.     Defendant Jared Polis ("Governor Polis") is the Governor of Colorado. Governor Polis is the chief executive responsible for executing Colorado law. *Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008) ("Colorado has long recognized the practice of naming the governor, in his role as the state's chief executive, as the proper defendant in cases where a party

---

[1] *See State of Colorado ex rel. Weiser v. Zwinck*, Case No. 2025CV30303 (Colo. 21st Jud. Dist. Ct.).

seeks to enjoin or mandate enforcement of a statute, regulation, ordinance, or policy.") (quotation omitted). Governor Polis is sued in his official capacity.

12.    At all relevant times, Defendants, as well as those subject to their supervision, direction, and/or control, are acting under color of state law.

13.    Counts I–III arise under the Constitution and the laws of the United States. This court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

14.    This court may exercise supplemental jurisdiction over Count IV because it arises out of a common nucleus of operative facts as the claims for which this court has original jurisdiction and thus forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

15.    The court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

16.    There is an actual controversy of sufficient immediacy and concreteness relating to Plaintiffs' rights and legal duties. As of May 23, 2025, C.R.S. §§ 24-74-103, 24-74-104 went into effect against employees of political subdivisions (including Plaintiffs) and C.R.S § 24-74-107 subjects Plaintiffs to civil fines up to $50,000, an injunction for each violation of Article 74, and other immediate and irreparable harm to their careers, reputations, and the like.

17.    Absent a declaration interpreting Article 74 or an injunction enjoining its enforcement, Plaintiffs face the imminent threat of civil liability and penalties under an unconstitutionally vague law as well as harm to their careers and reputations.

18.    The harm to Plaintiffs as a direct result of the actions and threatened actions of Defendants is sufficiently real and imminent to warrant the issuance of declaratory judgment and prospective injunctive relief.

19.    This court's immediate review of Article 74's constitutionality is necessary to prevent significant harm and ongoing and imminent infringement of Plaintiffs' fundamental constitutional rights.

20.    Venue in the United States District Court for the District of Colorado is proper under 28 U.S.C. § 1391(b)(1), (2).

## FACTUAL BACKGROUND

### A.    Article 74

21.    Article 74 first went into effect on June 25, 2021, and only applied to state agencies and state agency employees and not to employees of political subdivisions. 2021 Colo. SB. 131.

22.    On May 23, 2025, Governor Polis signed SB 276 which, among other things, amended Article 74 to apply to "political subdivision employees," which are defined to include a "person in the service of [a county or municipality] while acting in the person's employment capacity." *See generally* 2025 Colo. SB. 276; *see also* C.R.S. § 24-74-102(1.5)–(1.6). The amendments went into effect the same day. *See* 2025 Colo. SB. 276.

23.    Article 74 generally appears to prohibit Plaintiffs and other political subdivision employees from disclosing or seeking personal identifying information ("PII") that is related to, or could be used in furtherance of, federal civil immigration enforcement and it authorizes penalties against individuals who violate its provisions.

### 1.    *C.R.S. § 24-74-103*

24.    C.R.S. § 24-74-103(1) prohibits a political subdivision employee from "disclos[ing] or mak[ing] accessible . . . personal identifying information that is not publicly available information for the purpose of investigating for, participating in, cooperating with, or

assisting in federal immigration enforcement . . . except as required by federal or state law, including . . . requirements that are necessary to perform state agency or political subdivision duties, or as required to comply with a court-issued subpoena, warrant, or order."

25.    C.R.S. § 24-74-103(2) goes on to state that "article 74 shall not interfere with criminal investigations or proceedings that are authorized by judicial process or to restrict a state agency employee or political subdivision employee from fully investigating, participating in, cooperating with, or assisting federal law enforcement agencies in criminal investigations."

26.    C.R.S. § 24-74-102(1) broadly defines PII to mean "information that may be used, along or in conjunction with any other information, to identify a specific individual."[2]

27.    C.R.S. § 24-74-102(2) defines "publicly available information" as information that is available to the public online, in person, or through a request for records under part 2 (Colorado's Open Record Act) or part 3 (Colorado's Criminal Justice Records Act) of title 24, article 72. Notably, it does not define what makes information public.

28.    Multiple aspects of these provisions lack sufficient definiteness, rendering them unconstitutionally vague.

---

[2] PII includes, but is not limited to, "a name; a date of birth; a place of birth; a social security number or tax identification number; a password or pass code; an official government-issued driver's license or identification card number; information contained in an employment authorization document; information contained in a permanent resident card; vehicle registration information; a license plate number; a photograph, electronically stored photograph, or digitized image; a fingerprint; a record of a physical feature, a physical characteristic, a behavioral characteristic, or handwriting; a government passport number; a health insurance identification number; an employer, student, or military identification number; a financial transaction device; a school or educational institution attended; a source of income; medical information; biometric data; financial and tax records; home or work addresses or other contact information; family or emergency contact information; status as a recipient of public assistance or as a crime victim; race; ethnicity; national origin; immigration or citizenship status; sexual orientation; gender identity; physical disability; intellectual and developmental disability; or religion." C.R.S. § 24-74-102(1).

29.     For example, Article 74 fails to define what it means to "disclose" or "make accessible" PII to federal agents. In the context of multi-agency, multi-jurisdictional task forces, on its face, the statute appears to proscribe, but does not specifically define or address, the sharing of *any* information that *could* also be used for immigration enforcement.

30.     Notably, it is not uncommon for federal agents or officers to serve multiple roles for multiple agencies, including for one of the immigration enforcement agencies (e.g., Federal Bureau of Investigation ("FBI")/Immigration and Customs Enforcement ("ICE"), Drug Enforcement Agency ("DEA")/Customs and Border Patrol). Thus, Plaintiffs or other political subdivision employees may unknowingly disclose or "make available" information to federal authorities acting in these dual roles. As written, the statute provides no constitutionally sufficient detail to inform a person of reasonable intelligence whether such activities do or do not violate the statute.

31.     Similarly, Article 74 fails to indicate whether § 24-74-103's prohibition against sharing PII for "the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement" is limited to disclosing PII for the *sole* purpose of aiding or participating in federal immigration enforcement or whether it is sufficient that such enforcement was *a* purpose for the disclosure of PII.

32.     Additionally, the statute is vague because it is unclear whether there is liability for a political subdivision employee who discloses information for purposes unrelated to federal immigration enforcement, but the information is later used for such purposes by federal immigration enforcement officials.

33.     Also, the statute is vague as to the political subdivision employee who intentionally provides information to a federal agent for one purpose, for example, drug enforcement, knowing that the federal agent is also working on an immigration task force and the information, intended for drug enforcement, could then be used for immigration enforcement.

34.     While § 24-74-103 states that it "shall not interfere with criminal investigations . . . or to restrict a state agency employee or political subdivision employee from fully investigating, participating in, cooperating with, or assisting federal law enforcement agencies in criminal investigations[,]" the scope of this exception is unknown. It is unclear whether a criminal investigation must be the sole purpose for a disclosure for the safe harbor provision to apply.

35.     Similarly, it is unclear when disclosure is permitted as "necessary to perform state agency of political subdivision duties."

36.     The scope of information deemed publicly available, too, is vague. For example, an individual's license plate is included as PII under Article 74. But, by law, a license plate must be in view to the public, front and back, when driving on public roads. *See* C.R.S. § 42-3-202. That begs the question: is a license plate "publicly available information" under Article 74? Likewise, if someone posts a car and license plate on social media, what is the result then? Unless enjoined or construed by the court, Plaintiffs are left guessing whether information is publicly available or not.

### 2.     *C.R.S. § 24-74-104*

37.     Under C.R.S. § 24-74-104(1), a political subdivision employee "shall not inquire into, or request information or documents to ascertain, a person's immigration status for the purpose of identifying if the person has complied with federal immigration laws, including civil

immigration laws and 8 U.S.C. sec. 1325 or 1326, except as required by state or federal law or as necessary to perform state agency or political subdivision duties[.]"

38.    This provision, too, fails to clarify whether the prohibition against inquiring into a person's immigration status "for the purpose of identifying if the person has complied with federal immigration laws" applies to an inquiry for the *sole* purpose of determining compliance with federal immigration laws or whether it is sufficient that determining compliance was *a* purpose for the inquiry.

39.    Law enforcement officers, like Plaintiffs, regularly use lines of inquiry into an individual's immigration status to assess the possibility of potential drug trafficking, human smuggling, and other crimes.

40.    Accordingly, the exception allowing for inquiry into an individual's immigration status when it is "required by state or federal law or as necessary to perform state agency or political subdivision duties," does not provide any guidance when such inquiry is "necessary to perform" political subdivision duties independent of immigration enforcement and whether that performance must be the *sole* purpose or simply *a* purpose.

### 3.    *C.R.S. § 24-74-107*

41.    Section 24-74-107(1) provides that a "political subdivision employee who intentionally violates a provision of this article 74 is subject to an injunction and is liable for a civil penalty of not more than fifty thousand dollars for each violation."

42.    Although § 24-74-107(1) authorizes penalties for those who "intentionally" violate one of Article 74's provisions, it is silent as to actions that disclose or make available information in some manner other than intentionally, such as negligently or knowingly.

43.    However, as C.R.S. § 24-74-103(1) is written, it appears that it is a violation of the statute to disclose or make information available under all circumstances. Accordingly, the statute is impermissibly vague because it fails to identify, in a manner that a person of reasonable intelligence could understand, whether this applies to a knowing but unintentional violation, such as intentionally disclosing information necessary for an unrelated criminal investigation to a federal officer under circumstances where the employee knows that the federal officer is also involved in immigration enforcement.

44.    Similarly, the statute fails to identify what the intentional conduct must be. In other words, must an employee intend to violate the statute, must he or she intend to disclose information for purposes of assisting in immigration enforcement, is it enough to intend to disclose information even if the employee did not know it would ultimately be used in immigration enforcement or it is enough that an employee intentionally participated in a multi-agency taskforce and should have known that ICE was watching and gathering information? The statute answers none of these fundamental questions.

45.    Additionally, Article 74 leaves open the question of whether a political subdivision managerial employee, such as Plaintiffs, may be liable under some form of vicarious liability for conduct of employees they direct and supervise.

46.    Thus, can a plaintiff, for example, Matthew King, be held liable for an employee's violation of Article 74. As a supervisor, Plaintiff King is required, among other things, to coordinate and assign officers to multi-agency task forces. As the examples discussed herein illustrate, it is unclear from the statute whether Plaintiff King is either allowed to do so if there is any chance that information developed in those task forces might be used for immigration

enforcement, and, if it is, what is his personal exposure as the primary link in that chain? The statute fails to provide Plaintiff King or any person of reasonable intelligence, notice of their potential liability exposure.

47.     Further, on information and belief, the State of Colorado is considering prosecuting and has begun investigating political subdivisions (including the MCSO) for violations of Article 74 through policies, practices and customs akin to *Monell*[3] liability. The statutes, however, are silent on this issue giving rise to unconstitutional vagueness as to whether such investigations can, in any way, be grounded in Article 74 and whether such investigation can individually target supervisors such as Plaintiffs.

48.     Taken together, the vagueness of the statutes, and the complete lack of any indication of the scope of liability, especially considering threatened supervisory liability, renders the statutes unconstitutional.

49.     Further, Article 74 is void for vagueness because it fails to identify or define whether it is applicable to employees acting only in their official capacity or in all capacities. In other words, an employee of reasonable intelligence cannot tell if the statute proscribes conduct while they are at work or whether the proscription extends to the entirety of their life or somewhere in between.

50.     It seems clear that a proscription that bars a citizen from cooperating and communicating with the federal government infringes several rights, not the least of which is free speech under the First Amendment.

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

51.     Due to the impermissible vagueness of the statutes, it is difficult to identify their scope.  However, to the extent the statutes are read to proscribe protected speech, they fail to satisfy constitutional demands for that reason in addition to the reasons set forth herein.

**B.      Federal immigration laws and the Supremacy Clause**

52.     The Constitution gives Congress the authority to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3.

53.     Under federal law, a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Department of Homeland Security ("DHS") "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also* 8 U.S.C. §§ 1357(g)(10)(A); 1644.

54.     8 U.S.C. § 1373(b) provides: "[N]o person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity."

55.     Plaintiffs personally provide, supervise, or direct guidance and training to MCSO employees they supervise, including training on the level of cooperation with federal agencies within DHS.

56.     The United States, through the Attorney General, has already initiated an action on the question of whether Article 74 violates the Supremacy Clause. *See United States of America v. State of Colorado et al.*, No. 1:25-cv-01391-GPG-KAS (D. Colo.).

57. Plaintiffs concur with the United States that Article 74 impermissibly bars political subdivision employees from complying with the foregoing federal law.

**C.      MCSO employees, including Plaintiffs Rowell, King, and Brammer, have statutory obligations to gather PII, engage in law enforcement taskforces and the like, that directly conflict with Article 74.**

58. The MCSO, and Plaintiffs as senior officers, are statutorily obligated to provide law enforcement for unincorporated Mesa County, Colorado. Among other statutory duties, the MCSO and Plaintiffs are required to provide and run a county jail, transport prisoners, administer concealed gun permits, effectuate service of process, and generally keep the peace. *See* C.R.S. §§ 30-10-501 et seq.

59. In the course of fulfilling their duties, MCSO employees, including Plaintiffs, regularly transmit substantial amounts of PII to databases for non-immigration purposes that are accessible to federal law enforcement agencies with the authority to investigate and enforce federal immigration laws.

60. Plaintiffs themselves transmit information that could be deemed PII for non-immigration purposes to federal agencies as part of their duties regarding funding reports, requests for proceeds from civil asset forfeitures, background checks, and the coordination and transportation of prisoners.

61. Plaintiffs direct, manage, and supervise specialized teams discussed in more detail below such as the Western Colorado Drug Task Force, the Internet Crimes Against Children Task Force, and Major Offender Task Force. Each of these teams work closely with federal law enforcement agencies, including sharing PII and law enforcement intelligence, to target crime within Mesa County, Colorado unrelated to immigration.

13

62.    PII collected by MCSO employees, including Plaintiffs, is uploaded by them to the Colorado Bureau of Investigation ("CBI") and other databases like the National Crime Information Center ("NCIC") and Colorado Crime Information Center ("CCIC").  These databases and the PII contained therein are routinely shared between law enforcement agencies to prevent crime. Such information is automatically accessible by the FBI and other federal agencies, including those with the authority to investigate and enforce federal immigration law.

63.    The PII provided to these databases is directly traceable to MCSO employees, and when someone views that information, it shows that it originated from the department and in some cases, specific employees.

**D.    MCSO employees, including Plaintiffs, participate in numerous task forces involving multiple agencies that expose them to Article 74 liability.**

*1.    Western Colorado Drug Task Force*

64.    MCSO has received High Intensity Drug Trafficking Areas ("HIDTA") funds since 1996 and participated in the Western Colorado Drug Task Force ("WCDTF") since at least 1998.

65.    All three Plaintiffs have personal supervisory responsibility over the WCDTF and in some cases may personally participate in WCDTF operations.

66.    WCDTF is a cooperative task force that includes local and federal law enforcement agencies.

67.    WCDTF's goals are to (i) assist with locating and arresting dangerous wanted criminals; (ii) work with other law enforcement officers on more complex criminal investigations; and (iii) provide education to children on the dangers of drugs.

68.    Members of the WCDTF include employees from the DEA, the 21st District Attorney's Office, MCSO, and the Grand Junction Police Department.

14

69.     Members of the WCDTF, including MCSO employees, have, until recently, patrolled I-70 for purposes of apprehending drug smugglers.

70.     Members of DEA and Homeland Security Investigation ("HSI") will often provide federal law enforcement intelligence as part of the cooperation between WCDTF members.

71.     This information is not typically available to local law enforcement officers and comes from federal law enforcement databases. Such information is necessary for WCDTF to properly perform its functions.

72.     The information provided by DEA and HSI to WCDTF members can include criminal histories, financial information, and border crossings, which helps local law enforcement find drug traffickers on I-70 and other state highways.

73.     In order to obtain access to this information, members of the WCDTF are under a reciprocal obligation to provide PII to DEA and HSI so that these federal agencies can, in turn, run searches and obtain the information to provide task force members in the field.

74.     WCDTF members often provide this information to DEA and HSI through a communication application known as "Signal" because DEA and HSI do not have access to local dispatch systems.

75.     DEA and HSI may use the information provided by WCDTF to enforce federal immigration laws,[4] and Plaintiffs and other WCDTF members have no way of knowing, or preventing, DEA and HSI team members from using PII for such purposes.

---

[4] As of January 22, 2025, employees of the United States Marshals Service and DEA have Title 8 enforcement authority. *See* Immigration Policy Tracking Project, *DHS authorizes DOJ personnel to enforce immigration law as immigration officers*, https://immpolicytracking.org/policies/dhs-grants-broader-immigration-arrest-powers-to-justice-dept-federal-agents/#/tab-policy-documents (last accessed Aug. 6, 2025); Department of Homeland Security, *Statement from a DHS Spokesperson on Directive Expanding*

### 2. Internet Crimes Against Children Task Force

76.    All three Plaintiffs personally oversee the Internet Crimes Against Children Task Force ("ICAC") and in some cases may personally participate in ICAC operations.

77.    ICAC is a task force comprised of the MCSO and federal law enforcement partners that targets suspects who use the internet to solicit underage individuals for sex.

78.    ICAC includes investigators from HSI.

79.    HSI provides grant funding to the MCSO to investigate internet sex crimes against children.

80.    As part of ICAC, MCSO and HSI employees cooperate in joint operations to engage individuals who are seeking sex with minors over the internet.

81.    Law enforcement officers from both agencies will pose as children on the internet and interact with adults.

82.    When an adult begins asking the fictitious "children" to meet to perform inappropriate sexual acts with them, MSCO and HSI operatives will direct the adult to meet them at a local hotel or other public place.

83.    When the adult arrives at that public place, law enforcement officers will arrest the adult.

84.    Throughout these investigations, ICAC members share PII with each other.

85.    As noted above, HSI agents also have authority under U.S.C. Title 8 and can use this information to enforce federal immigration laws.

---

*Immigration Law Enforcement to Some Department of Justice Officials,* https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement (last accessed Aug. 6, 2025).

86.     Sometimes these investigations do not lead to criminal charges, however HSI has still obtained PII from the MCSO and may use that information for federal immigration enforcement.

87.     Plaintiffs and ICAC members have no way of knowing, or preventing, federal ICAC team members from using PII for such immigration enforcement purposes.

### 3.     *Major Offender Task Force*

88.     All three Plaintiffs oversee the Major Offender Task Force ("MOTF") and in some cases personally participate in MOTF operations.

89.     MOTF is a task force formed in 2020 with grant funding from the U.S. Department of Justice.

90.     The task force includes employees of MCSO and the U.S. Marshal's Service ("USMS").

91.     The purpose of MOTF is to identify and apprehend high-profile repeat offenders in Mesa County, track all sex offenders in Mesa County, and work in close partnership with local, state, and federal law enforcement agencies to locate and arrest fugitives across the Western Slope of Colorado.

92.     To achieve this goal, members of MOTF may be required to share PII related to criminal investigations.

93.     USMS has U.S.C. Title 8 authority to enforce federal immigration laws.

94.     USMS can therefore use the PII from these joint investigations to enforce federal immigration laws even when no criminal charges are filed and Plaintiffs and MOTF members have

no way of knowing, or preventing, USMS team members from using PII for such immigration enforcement purposes.

### 4.    *Joint Task Forces, Generally*

95.    WCDTF, ICAC, and MOTF are all targeted at eliminating serious crime in Mesa County, Colorado.

96.    Plaintiffs are responsible for ensuring that these specialized teams operate within the authority provided by law.

97.    Federal law enforcement agencies provide valuable assistance to the MCSO by providing resources that are not otherwise available to local law enforcement agencies.

98.    As part of these task forces, federal law enforcement agencies provide grant funding to the MCSO to help combat crime.

99.    Plaintiffs Rowell and King are responsible for grant funding reporting to the federal government for money received to run these specialized teams.

100.    Federal reporting requirements require Plaintiffs Rowell and King to provide PII to the federal government to ensure that federal money is being spent to investigate specific (non-immigration) crimes.

101.    Plaintiffs Rowell and King issue reports and requests regarding civil asset forfeiture of property seized during joint task force operations, many of which include case-specific PII.

102.    Plaintiffs are in danger of significant immediate harm because these task forces have historically shared PII with federal law enforcement agencies for purposes of joint criminal investigations, especially given that some of those investigations do not directly lead to criminal charges.

103.    As a direct and immediate consequence of Article 74's lack of clarity coupled with the severe penalties for noncompliance with its provisions and the potential for career and reputational damage, the MCSO and Plaintiffs have been forced to pull back from cooperating with federal law enforcement agencies and have suffered, and will suffer, a corresponding loss of grant funding.

104.    A further direct consequence of the unconstitutionally vague statutes is that investigations of serious crimes within Mesa County including drug smuggling, child exploitation, and major sex crimes have been adversely impacted.

105.    All three Plaintiffs are unable to engage in these critical crime fighting operations, either directly or in a supervisory role, out of fear that they will be subject to an enforcement action, punished financially and otherwise suffer serious harm.

**E.    Plaintiffs' other necessary and obligatory functions are subject to curtailment by the vagueness and uncertainty surrounding Article 74.**

*1.    Concealed Carry Permits*

106.    Colorado Sheriffs are required to issue written permits for concealed carry handguns. C.R.S. § 30-10-523.

107.    As part of the concealed carry application, Colorado Sheriffs are required to make sure that applicants for a concealed carry permit are permitted to possess a firearm under federal law. C.R.S. § 18-12-203.

108.    The Gun Control Act prohibits individuals in the county illegally from possessing a firearm. 18 U.S.C. § 922.

109.    Colorado Sheriffs are required to send an applicant's PII to CBI, which in turn sends the information to the FBI. C.R.S. § 18-12-205.

110.    The FBI has U.S.C. Title 8 authority to enforce federal immigration laws.

111.    Based on the application process, Sheriffs typically must ask individuals if they are in the country legally before they can issue a concealed carry permit.

112.    By supervising this process, both Plaintiffs Rowell and King are in danger of violating Article 74. On one hand, state law requires them to operate this application process, which includes providing the FBI with PII and citizenship information related to immigration status, in order to provide concealed carry permits. On the other hand, this puts them at odds with violating Article 74 if that information is later used for immigration enforcement.

113.    Plaintiffs and MCSO employees they supervise have no way of knowing, or preventing, FBI officials from using PII and citizenship information for such immigration enforcement purposes.

### 2.    *Jail Background Checks*

114.    Under Colorado law, Plaintiff Rowell is the custodian of the Mesa County Detention Facility and is required to transport prisoners. C.R.S. §§ 30-10-511, 30-10-514.

115.    As the Undersheriff, Plaintiff King is the employee responsible for supervising the Mesa County Detention Facility.

116.    As custodians of the Detention Facility, Plaintiffs Rowell and King, and the MCSO employees they supervise, collect PII on every individual who enters the detention facility.

117.    When individuals are arrested, whether they are in the country legally or not, the Mesa County Detention Facility staff will collect PII on the individual.

118.    This includes information such as names, dates of birth, known aliases, and biometric data.

119.    This PII is entered NCIC and CCIC, which are routinely shared between law enforcement agencies in an effort to prevent crime.

120.    The purpose of uploading this information into these databases is to help aid fellow law enforcement agencies around the country who may have cases involving those individuals. In other words, the information is used for non-immigration related law enforcement.

121.    County jails across Colorado will use NCIC and CCIC for bringing individuals who have warrants back to their jurisdictions for prosecution.

122.    Federal law enforcement agencies can search these databases for purposes of enforcing federal law, including immigration enforcement.

123.    For example, upon information and belief, members of ICE are able to monitor NCIC for purposes of federal immigration enforcement.

124.    As a consequence of the unconstitutional vagueness of Article 74, Plaintiffs Rowell and King have no way of knowing if the information they collect on individuals entering the Mesa County Detention Facility, or the databases they use for the purposes of running the Mesa County Detention Facility, violate Article 74.

### 3.    *Transportation/Exchange of Prisoners*

125.    Plaintiffs Rowell and King oversee transportation of prisoners to and from the Mesa County Detention Facility, which occasionally involves transport of individuals who are in the country illegally that were captured by federal law enforcement officials but are also wanted in Mesa County, Colorado for unrelated criminal conduct.

126.    In order for this cooperative framework to function properly, this process often requires the transfer and use of PII via the NCIC.

127.    Federal law enforcement agencies require Plaintiffs Rowell and King to agree that they will return these individuals to federal custody once their unrelated criminal case in Mesa County, Colorado is resolved.

128.    As part of the cooperative arrangement, federal law enforcement specifically insist that Plaintiffs Rowell and King continue to detain these individuals even if the individual's state criminal case is dismissed.

129.    Federal law enforcement agencies have made it clear they will not transfer custody of someone who is illegally in the country to Plaintiffs Rowell or King to face charges on non-immigration criminal conduct without this agreement.

130.    Article 74 puts Plaintiffs Rowell and King in danger of significant personal harm in attempting to enforce criminal law inasmuch as they are then required to transmit PII to federal law enforcement when the criminal case is completed and the individual is solely detained on the basis of a federal immigration detainer.

**F.      The State of Colorado is engaging in enforcement actions of Article 74 despite grave concerns raised herein and in other cases about its constitutionality.**

131.    On June 13, 2025, Plaintiff Rowell was made aware that a MCSO Deputy had pulled over an individual for a traffic violation on June 5, 2025.

132.    On June 5, 2025, that Deputy was a drug interdiction officer with the WCDTF.

133.    Plaintiff Brammer oversees and supervises MCSO participation in the WCDTF, including supervision of the Deputy.

134.    The Deputy noticed that the individual was following a semi-truck too closely, in violation of Colorado law.

135.    This behavior is common for drug smugglers because following closely behind semi-trucks can be used to obscure license plates from license plate readers.

136.    During this traffic stop, the Deputy is alleged to have sought out information potentially related to the individual's immigration status and provided information to DEA and HSI related to the individual through the Signal chat application. This information was necessary for proper operation of the WCDTF and was unrelated to immigration enforcement.

137.    Upon information and belief, based on that information, HSI detained the individual.

138.    On June 18, 2025, Plaintiff Rowell reached out to Attorney General Weiser to inform his office of the circumstances behind the traffic stop.

139.    On June 24, 2025, Plaintiff Rowell met with members of the Attorney General's staff and explained everything he knew about the traffic stop and agreed to cooperate with their investigation into the incident.

140.    At that time, Plaintiff Rowell was unaware of the scope of the Attorney General's investigation, but Plaintiff Rowell wanted to ensure that he and his office received guidance on how to move forward.

141.    Plaintiff Rowell requested that the Attorney General provide guidance on how to interact with federal law enforcement officers under the parameters of Article 74.

142.    To date, the Attorney General has failed to provide any guidance or otherwise issue an Attorney General Opinion so that Plaintiffs and their employees can do their jobs without fear of reprisal.

143.    Instead, on July 22, 2025, the Attorney General's Office filed a lawsuit against the Deputy involved in the traffic stop seeking civil remedies under Article 74. The lawsuit alleges that the Deputy provided PII to federal immigration authorities, even though he was conducting a legitimate, unrelated criminal investigation.

144.    When he allegedly provided information to HSI, the Deputy was part of a criminal investigation conducted by the WCDTF that was wholly unrelated to federal immigration enforcement.

145.    As a direct and proximate result of this incident, Plaintiff Brammer was disciplined for failure to supervise the Deputy.  Plaintiff Brammer had no documented discipline prior to this incident during his 15-year career with the MCSO.

146.    Upon information and belief, Attorney General Weiser has stated that his "main goal [with the enforcement action] is for law enforcement officers to know the state of Colorado is serious about enforcing the laws in question."[5] However, the Attorney General has failed to offer guidance to the Plaintiffs and their employees, leaving them unable to perform their jobs and placing them at risk of serious penalties and harm.

147.    Upon information and belief, Attorney General Weiser has stated that his office is also investigating broader alleged misconduct involving the Signal chat group to determine if they

---

[5] The Daily Sentinel, *Colorado AG sues Mesa County deputy involved in detention of Utah student*, https://www.gjsentinel.com/news/western_colorado/colorado-ag-sues-mesa-county-deputy-involved-in-detention-of-utah-student/article_3c0261aa-6ea5-4753-bf5f-3b254dbe9786.html (last accessed Aug. 6, 2025).

engaged in a "pattern or practice" of conduct that violates state laws.[6] This conduct places the

individual Plaintiffs at risk for penalties and additional harm to their livelihood and reputations.

148.    Given the overly broad nature of Article 74, and the Attorney General's decision to

prosecute the Deputy, all three Plaintiffs are unable to determine when and how they are legally

able to share PII and citizenship information with federal law enforcement agencies.

**G.    The State's inconsistent application of Article 74 creates additional due process concerns.**

149.    The hallmark of an unconstitutionally vague statute is that it allows for

unrestrained, arbitrary and capricious enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357

(1983) (holding that a statute is vague unless it is written "with sufficient definiteness that . . . does

not encourage arbitrary and discriminatory enforcement") (collecting cases).

150.    Upon information and belief, the State and its employees have allegedly violated

Article 74 on multiple occasions, in some cases under circumstances virtually identical to those

related to the Deputy that has been sued, but the Attorney General has not taken any action to

enforce Article 74 against them.

151.    The Attorney General's failure to apply the law uniformly has led to additional

confusion by Plaintiffs regarding the applicability and scope of Article 74 and demonstrates that it

cannot satisfy due process.

---

[6] Office of the Attorney General, *AG Weiser files lawsuit to hold Mesa sheriff's deputy liable after state investigation revealed illegal coordination with federal immigration officials*, https://coag.gov/press-releases/attorney-general-phil-weiser-lawsuit-mesa-sheriffs-deputy-federal-immigration/?utm_campaign=COAGSproutSocialCampaign&utm_content=1753215882&utm_medium=social&utm_source=facebook,linkedin,twitter (last accessed Aug. 6, 2025) ("The Attorney General's Office has an ongoing investigation into law enforcement involved in the Signal group chat to determine if they engaged in a pattern or practice of conduct that violates the state constitution or laws.").

152.    Plaintiffs find themselves subject to uncertainty and confusion after the Legislature's recent amendments to Article 74. With nowhere else to turn, Plaintiffs ask this court to declare Article 74 unconstitutional and issue preliminary and permanent injunctive relief enjoining Defendants' enforcement of the same.

### CLAIMS FOR RELIEF

### <u>COUNT I</u>
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. XIV § 1: Due Process Clause

153.    All preceding paragraphs are incorporated by reference.

154.    Under the Due Process Clause of the Fourteenth Amendment, a state statute "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

155.    The void-for-vagueness doctrine requires that a statute define the prohibition "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357 (collecting cases).

156.    For the reasons articulated above, C.R.S. §§ 24-74-103, 24-74-104, 24-74-107, fail to provide the requisite definiteness necessary to allow an ordinary person to understand what conduct the provisions prohibit or to discourage arbitrary and discriminatory enforcement.

157.    By enforcing and threatening enforcement of Article 74 against Plaintiffs, Defendants, under color of law, deprive Plaintiffs of the right of due process in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs are therefore damaged in

violation of their due process rights and are entitled to declaratory judgment establishing the same and injunctive relief against enforcement and maintenance of Defendants' unconstitutional actions.

158.    Plaintiffs will suffer irreparable harm absent injunctive and declaratory relief against Defendants that Article 74 is void and unenforceable.

## COUNT II
### 42 U.S.C. § 1983
### Violation of U.S. Const. Art. VI: Supremacy Clause

159.    All preceding paragraphs are incorporated by reference.

160.    The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

161.    C.R.S. §§ 24-74-103, 24-74-104, 24-74-107 violate the Supremacy Clause because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

162.    C.R.S. §§ 24-74-103, 24-74-104, 24-74-107 directly conflict with provisions of federal law. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

## COUNT III
### 28 U.S.C. § 2201
### Declaratory Judgment

163.    All preceding paragraphs are incorporated by reference.

164.    Plaintiffs are entitled to a declaratory judgment declaring Article 74 unconstitutional and therefore void and unenforceable for the reasons articulated herein.

165.    In the alternative, Plaintiffs seek a declaration from this court:

a.  That a political subdivision employee does not violate C.R.S. § 24-74-103 if he or she discloses or makes accessible personal identifying information in the course of a criminal investigation and *only* violates the statute if he or she discloses or makes accessible personal identifying information for the *sole* purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement";

b.  That a political subdivision employee does not violate C.R.S. § 24-74-104(1), if he or she inquires into an individual's immigration status for reasonable and legitimate law enforcement purposes, including, but not limited to, assessing human and/or drug trafficking;

c.  That vicarious liability is not available in any action brought under C.R.S. §§ 24-74-103, 24-74-104, or 24-74-107;

d.  Plaintiffs' rights and obligations in light of the conflict between C.R.S. §§ 24-74-103, 24-74-104 and federal law, including, but not limited to, 8 U.S.C. §§ 1373(a), 1644; and

e.  Otherwise construing Plaintiffs rights and obligations under Article 74 and state and federal law as necessary and appropriate.

166.  Plaintiffs' request for declaratory relief is ripe and fit for judicial resolution, as the questions Plaintiffs seek to resolve by declaratory judgment are pure questions of law that would not benefit from any factual development.

167.  Unless these questions are considered immediately, Plaintiffs will face hardship in the form of potential civil liability and penalties as stated herein.

168.   Plaintiffs' declaratory judgment claim would serve a useful purpose in clarifying their legal obligations under state and federal law.

## COUNT IV
### Violation of Colo. Const. Art. II, § 25

169.   All preceding paragraphs are incorporated by reference.

170.   Article II, § 25 of the Colorado Constitution guarantees that "[n]o person shall be deprived of life, liberty or property, without due process of law."

171.   "Due process requires laws to give fair warning of prohibited conduct so that individuals may conform their actions accordingly; it also demands that a penal statute establish standards that are sufficiently precise to avoid arbitrary and discriminatory enforcement." *Rocky Mt. Retail Mgmt., LLC v. City of Northglenn*, 393 P.3d 533, 539 (Colo. 2017) (citation omitted).

172.   Accordingly, state laws must "provide[] fair notice and set[] forth sufficiently definite standards to ensure uniform, nondiscriminatory enforcement." *Table Servs., Ltd. v. Hickenlooper*, 257 P.3d 1210, 1214 (Colo. App. 2011).

173.   For the reasons articulated above, C.R.S. §§ 24-74-103, 24-74-104, and 24-74-107 fail to provide the requisite notice or standards.

174.   Plaintiffs will suffer irreparable harm absent injunctive and declaratory relief against Defendants that Article 74 is void and unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the court:

a.   Enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 declaring that C.R.S. §§ 24-74-103, 24-74-104, 24-74-107 violate (i) the Due Process Clause of

the Fourteenth Amendment; and/or (ii) the Supremacy Clause; and/or (iii) article II, § 25 of the Colorado Constitution and are therefore void and unenforceable;

b.    Issue preliminary and permanent injunctive relief barring Defendants, their agents and employees, and all those acting in concert with them, from enforcing C.R.S. §§ 24-74-103, 24-74-104, and 24-74-107;

c.    In the alternative, enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring (i) that a political subdivision employee does not violate C.R.S. § 24-74-103 if he or she discloses or makes accessible personal identifying information in the course of a criminal investigation and *only* violates the statute if he or she *intentionally* discloses or makes accessible personal identifying information for the *sole* purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement"; (ii) that a political subdivision employee does not violate C.R.S. § 24-74-104(1), if he or she inquires into an individual's immigration status for reasonable and legitimate law enforcement purposes, including, but not limited to, assessing human and/or drug trafficking; (iii) that vicarious liability is not available in any action brought under C.R.S. §§ 24-74-103, 24-74-104, or 24-74-107; (iv) Plaintiffs' rights and obligations in light of the conflict between C.R.S. §§ 24-74-103, 24-74-104 and federal law, including, but not limited to, 8 U.S.C. §§ 1373(a), 1644; and (v) otherwise construing Plaintiffs rights and obligations under Article 74 and state and federal law as necessary and appropriate.

d.    Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and as otherwise available to the full extent under applicable law; and

e.    Award such other relief as the court may deem equitable, just, and proper.

Dated: August 7, 2025                    Respectfully Submitted,


                                         /s/ *Todd M. Starr*
                                         Todd M. Starr, Esq.
                                         John Rhoads, Esq.
                                         David Schwenke, Esq.
                                         Mesa County Attorney's Office
                                         Dept 5004, P.O. Box 20,000
                                         544 Rood Ave
                                         Grand Junction, CO  81502
                                         (970) 244-1612
                                         todd.starr@mesacounty.us
                                         john.rhoads@mesacounty.us
                                         david.schwenke@mesacounty.us

                                         and

                                         /s/ *Andrew B. Clauss*
                                         Andrew B. Clauss, Esq.
                                         Chris W. Brophy, Esq.
                                         Jeana M. Mason, Esq.
                                         Jacob W. Carruthers, Esq.
                                         DINSMORE & SHOHL LLP
                                         1775 Sherman Street, Suite 2600
                                         Denver, Colorado 80203
                                         (303) 831-6971
                                         andrew.clauss@dinsmore.com
                                         chris.brophy@dinsmore.com
                                         jeana.mason@dinsmore.com
                                         jacob.carruthers@dinsmore.com

                                         *Attorneys for Plaintiffs*